**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGEL LOPEZ-VALENZUELA; ISAAC
CASTRO-ARMENTA,
*Plaintiffs-Appellants*,

v.

JOSEPH M. ARPAIO, Maricopa
County Sheriff, in his official
capacity; COUNTY OF MARICOPA;
WILLIAM GERARD MONTGOMERY,
Maricopa County Attorney, in his
official capacity,
*Defendants-Appellees*.

No. 11-16487

D.C. No.
2:08-cv-00660-
SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted En Banc
March 18, 2014—San Francisco, California

Filed October 15, 2014

Before: Alex Kozinski, Chief Judge, and Diarmuid
O'Scannlain, Sidney R. Thomas, M. Margaret McKeown,
Raymond C. Fisher, Marsha S. Berzon, Richard C.
Tallman, Jay S. Bybee, Milan D. Smith, Jr., Jacqueline H.
Nguyen, and Paul J. Watford, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Nguyen;
Dissent by Judge Tallman;
Dissent by Judge O'Scannlain

## SUMMARY[*]

### Civil Rights

The en banc court reversed the district court's summary judgment in a class action challenging Proposition 100, a ballot measure passed by Arizona voters that amended the state constitution to preclude bail for certain serious felony offenses if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the charge.

The en banc court held that Proposition 100, and its implementing laws and rules, violate the substantive component of the Due Process Clause of the Fourteenth Amendment. Applying the heightened substantive due process scrutiny set forth in *United States v. Salerno*, 481 U.S. 739, 746-48 (1987), the en banc court held that the Proposition 100 laws do not address an established "particularly acute problem," are not limited to "a specific category of extremely serious offenses," and do not afford the individualized determination of flight risk or dangerousness that *Salerno* deemed essential. Rather, the laws represent a scattershot attempt at addressing flight risk and are not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

narrowly tailored to serve a compelling interest. In addition, the en banc court held that the challenged laws are excessive in relation to the state's legitimate interest in assuring arrestees' presence for trial.

Concurring, Judge Nguyen agreed with the majority that Proposition 100 violates substantive due process. She wrote separately to address the record of legislative intent, which she believed demonstrates that Proposition 100 was intentionally drafted to punish undocumented immigrants for their "illegal" status, even if they pose no flight risk or danger to the community.

Dissenting, Judge Tallman, joined by Judge O'Scannlain, stated that Proposition 100 is not excessive in relation to Arizona's compelling regulatory interest in ensuring that illegal aliens who commit serious felony offenses stand trial.

Dissenting, Judge O'Scannlain stated that the question of whether denying bail to illegal immigrants based on flight risk is unconstitutionally excessive should have been analyzed under the Eighth Amendment's Excessive Bail Clause. Judge O'Scannlain tentatively concluded that the Eighth Amendment does not restrict legislative discretion to declare certain crimes nonbailable.

## COUNSEL

Andre I. Segura and Esha Bhandari, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York; Cecillia D. Wang (argued) and Kenneth J. Sugarman, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California; Daniel Pochoda, ACLU Foundation of Arizona, Phoenix, Arizona, for Plaintiffs-Appellants.

Timothy J. Casey (argued), Schmitt Schneck Smyth Casey & Even, P.C., Phoenix, Arizona, for Defendants-Appellees Maricopa County and Joseph M. Arpaio.

Bruce P. White and Anne C. Longo, Deputy County Attorneys, Maricopa County Civil Services Division, Phoenix, Arizona, for Defendant-Appellee Maricopa County Attorney William Montgomery.

Anthony O'Rourke, Associate Professor, SUNY Buffalo Law School, for Amici Curiae Constitutional Criminal Law and Immigration Law Professors.

Kathleen E. Brody, Osborn Maledon, P.A., Phoenix, Arizona; Amy Kalman and Mikel Steinfeld, Office of the Maricopa County Public Defender, Phoenix, Arizona; David Euchner, Office of the Pima County Public Defender, Tucson, Arizona, for Amicus Curiae Arizona Attorneys for Criminal Justice.

## OPINION

FISHER, Circuit Judge, with whom KOZINSKI, Chief Judge, and THOMAS, McKEOWN, BERZON, BYBEE, M. SMITH and NGUYEN, Circuit Judges, join in full, and with whom WATFORD, Circuit Judge, joins except as to section III.B.2:

Arizona law categorically forbids granting undocumented immigrants arrested for a wide range of felony offenses any form of bail or pretrial release, even if the particular arrestee is not a flight risk or dangerous. We must decide whether such an absolute denial comports with the substantive component of the Due Process Clause of the Fourteenth Amendment. We hold that it does not.

**I.**

In 2006, Arizona voters overwhelmingly approved an amendment to their state constitution known as Proposition 100.[1] Proposition 100 mandates that Arizona state courts may not set bail "[f]or serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge." Ariz. Const. art. 2, § 22(A)(4). In a separate enactment, the Arizona legislature defined "serious felony offenses" as any class 1, 2, 3 or 4 felony or aggravated driving-under-the-influence offense. *See* Ariz. Rev. Stat. Ann. § 13-3961(A)(5)(b).

---

[1] The Arizona legislature passed the legislation and referred it to the voters in May 2005. The voters approved Proposition 100 in November 2006.

The Proposition 100 bail determination is made at an initial appearance, which under Arizona law occurs within 24 hours of arrest. *See* Ariz. R. Crim. P. 4.1(a). At the initial appearance, the court must deny bail, irrespective of whether the arrestee poses a flight risk or a danger to the community, "if the court finds (1) that the proof is evident or the presumption great that the person committed a serious offense, and (2) probable cause that the person entered or remained in the United States illegally." Ariz. R. Crim. P. 7.2(b). An arrestee deemed ineligible for bail at the initial appearance may move for reexamination, and a hearing on such motion "shall be held on the record as soon as practicable but not later than seven days after filing of the motion." Ariz. R. Crim. P. 7.4(b). At the follow-up proceeding, known as a *Simpson/Segura* hearing, *see Simpson v. Owens*, 85 P.3d 478 (Ariz. Ct. App. 2004); *Segura v. Cunanan*, 196 P.3d 831 (Ariz. Ct. App. 2008), the arrestee can dispute whether there is probable cause that he or she entered or remained in the United States illegally, but may not refute Proposition 100's irrebuttable presumption that he or she poses an unmanageable flight risk. Once the court determines that there is probable cause to believe an arrestee has entered or remained in the United States unlawfully, the court has no discretion to release the arrestee under any circumstances, even if the court would find – and the state would concede – that the particular arrestee does not pose a flight risk or danger to the community.

In 2008, plaintiffs Angel Lopez-Valenzuela and Isaac Castro-Armenta filed a class action complaint against Maricopa County, the Maricopa County Sheriff, the Maricopa County Attorney and the Presiding Judge of the Maricopa County Superior Court, challenging the constitutionality of Proposition 100 and its implementing laws and rules ("the

Proposition 100 laws"). At the time the complaint was filed, both plaintiffs were charged with state crimes and held in Maricopa County jails as a result of orders finding that they had entered or remained in the United States illegally. The complaint proposed a plaintiff class consisting of "All persons who have been or will be held ineligible for release on bond by an Arizona state court in Maricopa County pursuant to Section 22(A)(4) of the Arizona Constitution and Ariz. Rev. Stat. § 13-3961(A)(5)."

The plaintiffs alleged that the Proposition 100 laws violate the United States Constitution in a number of ways. As relevant here, they alleged that the Proposition 100 laws violate the substantive due process guarantees of the Fourteenth Amendment on two theories: (1) arrestees have a liberty interest in being eligible for release on bond pending resolution of criminal charges and the Proposition 100 laws are not narrowly tailored to serve a compelling governmental interest; and (2) the laws impermissibly impose punishment before trial. The plaintiffs also alleged violations of the procedural due process guarantees of the Fourteenth Amendment, the Fifth Amendment right against self-incrimination, the Sixth Amendment right to counsel, the Excessive Bail Clause of the Eighth Amendment and the Supremacy Clause, alleging that the Proposition 100 laws are preempted by federal law. They sought an order declaring the Proposition 100 laws unconstitutional, enjoining the enforcement of those laws and affording each of them an individualized bail hearing at which they may be considered for release, taking into account particularized facts about whether release would pose an unacceptable risk of flight or danger to the community.

In a December 2008 order, the district court granted the plaintiffs' motion for class certification, certifying a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The court also granted the defendants' motion to dismiss the plaintiffs' preemption claims under Rule 12(b)(6).

The parties filed cross motions for summary judgment. In a March 2011 order, the district court denied the plaintiffs' motion for summary judgment and granted the defendants' motion for partial summary judgment on the plaintiffs' substantive due process, procedural due process, Eighth Amendment and Sixth Amendment claims. *See* Fed. R. Civ. P. 56. The plaintiffs thereafter voluntarily dismissed their Fifth Amendment claim. The district court then entered a final judgment, from which the plaintiffs timely appealed, challenging the Rule 12(b)(6) dismissal of their preemption claims and the adverse summary judgment rulings on their substantive due process, procedural due process, Eighth Amendment and Sixth Amendment claims.

After a divided three-judge panel of this court affirmed the judgment of the district court, a majority of nonrecused active judges voted in favor of rehearing en banc. *See Lopez-Valenzuela v. Cnty. of Maricopa*, 719 F.3d 1054, 1073 (9th Cir. 2013), *reh'g en banc granted*, 741 F.3d 1015 (9th Cir. 2014). We have jurisdiction under 28 U.S.C. § 1291, and we now reverse.[2]

---

[2] Although we assume that the named plaintiffs are no longer in pretrial detention, no one has suggested that this case has become moot as a consequence. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 987 (9th Cir. 2007) (en banc) ("With regard to mootness, the Supreme Court held that the 'cases or controversies' requirement of Article III – which requires a plaintiff with a live case or controversy, not only at the time of filing and at the time of class certification, but also when a court reviews

## II.

We review de novo a district court's grant or denial of summary judgment. *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1041 (9th Cir. 2011). We also review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). We review a challenge to the constitutionality of a statute de novo as well. *See United States v. Gonzales*, 307 F.3d 906, 909 (9th Cir. 2002).

## III.

The plaintiffs contend that the Proposition 100 laws violate substantive due process. We agree.

## A.

The Supreme Court has long recognized constitutional limits on pretrial detention. The Court has prohibited excessive bail, *see Stack v. Boyle*, 342 U.S. 1, 4–5 (1951), required a judicial determination of probable cause within 48 hours of arrest, *see Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975), barred punitive conditions of pretrial confinement, *see Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979), prohibited pretrial detention as punishment, *see United States v. Salerno*, 481 U.S. 739, 746–48 (1987); *Schall v. Martin*, 467 U.S. 253,

---

the case – is satisfied by 'a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.'" (quoting *Sosna v. Iowa*, 419 U.S. 393, 402 (1975))).

269–74 (1984), and held that restrictions on pretrial release of adult arrestees must be carefully limited to serve a compelling governmental interest, *see Salerno*, 481 U.S. at 748–51.

In the first of these cases, *Stack v. Boyle*, the Court observed that the "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." 342 U.S. at 4. The Court noted that, "[u]nless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning," *id.*, and it held that "[b]ail set at a figure higher than an amount reasonably calculated to fulfill [its] purpose [of assuring the presence of the accused at trial] is 'excessive' under the Eighth Amendment," *id.* at 5.

In *Gerstein v. Pugh*, the Court recognized that "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, . . . impair his family relationships" and affect his "ability to assist in preparation of his defense." 420 U.S. at 114, 123. The Court held "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114. This probable cause determination is "necessary to effect limited postarrest detention," *Salerno*, 481 U.S. at 752, and ordinarily must occur within 48 hours of arrest, *see McLaughlin*, 500 U.S. at 56.

A few years later, in *Bell v. Wolfish*, the Court emphasized that, "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt." 441 U.S. at 535. Accordingly, the Court held that "the Due Process Clause protects a detainee from . . . conditions and

restrictions of pretrial detainment" that "amount to punishment of the detainee." *Id.* at 533, 535. The Court outlined a two-pronged test for determining when conditions and restrictions of pretrial detention amount to punishment, focusing first on whether the restrictions were imposed for a punitive purpose and, if not, on whether the restrictions are excessive in relation to a legitimate regulatory purpose:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538–39 (alterations, footnotes, citations and internal quotation marks omitted).

Five years later, in *Schall v. Martin*, the Court considered the substantive due process implications of a state law authorizing pretrial detention of juvenile offenders found to present "a serious risk" of committing a crime pending their juvenile court proceedings. 467 U.S. at 255. As it would later do in *Salerno*, the Court applied a two-part substantive due process inquiry. First, relying on general due process principles, the Court considered whether the law constituted an impermissible infringement of the juveniles' liberty interest. *See Schall*, 467 U.S. at 263–68. The Court recognized that juveniles have a "substantial" interest in "freedom from institutional restraints," *id.* at 265, but that interest had to be "qualified by the recognition that juveniles, unlike adults, are always in some form of custody," *id.* Accordingly, in lieu of heightened scrutiny, the Court required the state to show only that the challenged law served a "legitimate interest." *Id.* at 266. This standard was satisfied because "[s]ociety has a legitimate interest in protecting a juvenile from the consequences of his criminal activity – both from potential physical injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child." *Id.*

Second, relying on the two-pronged test articulated in *Bell*, the Court considered whether the challenged law violated substantive due process by imposing confinement as punishment. *See id.* at 269–74. Applying the first prong of the *Bell* test, the Court found no evidence that the law was intended as punishment. *See id.* at 269. Turning to the second prong, the Court concluded that the law was not excessive in relation to the state's legitimate regulatory purpose in protecting juveniles from the consequences of their criminal activity, because the detention was "strictly

limited in time" (to a maximum possible detention of 17 days) and the conditions of confinement were regulatory rather than punitive. *Id.* at 269–71. The Court also found persuasive that every state in the country permitted preventive detention of juveniles accused of crime, *see id.* at 267, 274, citing "the widely shared legislative judgment that preventive detention serves an important and legitimate function in the juvenile justice system," *id.* at 272.

Three years later, in *United States v. Salerno*, the Court rounded out this series of pretrial detention cases by considering the substantive due process implications of a federal law authorizing pretrial detention of *adult* arrestees. *Salerno* involved a challenge to a provision of the federal Bail Reform Act of 1984 requiring pretrial detention of arrestees charged with certain serious felonies if the government demonstrated by clear and convincing evidence after an adversary hearing that no release conditions "will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e). As it had in *Schall*, the Court applied a two-part substantive due process inquiry, albeit in the reverse order.

First, relying on *Bell* and *Schall*, the Court considered whether the Act violated substantive due process by authorizing "punishment before trial." *Salerno*, 481 U.S. at 746. Under the first *Bell* prong, the Court found no evidence that Congress had authorized pretrial detention for a punitive purpose. *See id.* at 747. Rather, Congress had authorized detention for the legitimate regulatory purpose of "preventing danger to the community." *Id.* Turning to *Bell*'s second prong, the Court held that "the incidents of pretrial detention" were not "excessive in relation to the regulatory goal Congress sought to achieve," because: (1) the Act "carefully

limits the circumstances under which detention may be sought to the most serious of crimes," including "crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders"; (2) "[t]he arrestee is entitled to a prompt detention hearing" at which the arrestee could seek bail; and (3) "the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *Id.* Accordingly, the Court held "that the pretrial detention contemplated by the Bail Reform Act is regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause." *Id.* at 748.

Second, as in *Schall*, the Court also applied general due process principles and considered whether the law constituted an impermissible infringement of arrestees' liberty interest. *See id.* at 748–51. Whereas *Schall* had applied a deferential standard of review, however, *Salerno* applied heightened scrutiny. The Court noted that, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* at 755. It cited "the 'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Id.* at 749. It recognized that the Act implicated "the individual's strong interest in liberty." *Id.* at 750. And it was careful "not [to] minimize the importance and fundamental nature of this right." *Id.* But the Court concluded that the Bail Reform Act satisfied heightened scrutiny because it both served a "compelling" and "overwhelming" governmental interest "in preventing crime by arrestees" and was "carefully limited" to achieve that purpose. *Id.* at 749–50, 755. The Act was sufficiently tailored because it "careful[ly] delineat[ed] . . . the circumstances under which detention will be permitted." *Id.* at 751. It: (1) "narrowly focuse[d] on a

particularly acute problem in which the Government interests are overwhelming," *id.* at 750; (2) "operate[d] only on individuals who have been arrested for a specific category of extremely serious offenses" – individuals that "Congress specifically found" were "far more likely to be responsible for dangerous acts in the community after arrest," *id.*; and (3) afforded arrestees "a full-blown adversary hearing" at which the government was required to "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person," *id.* It satisfied heightened scrutiny because it was a "carefully limited exception," *id.* at 755, not a "scattershot attempt" at preventing crime by arrestees, *id.* at 750.

**B.**

*Salerno* and *Schall* establish the substantive due process framework that governs here. We first consider whether the Proposition 100 laws satisfy general substantive due process principles. Because the Proposition 100 laws regulate adults rather than juveniles, we apply *Salerno*'s heightened scrutiny rather than *Schall*'s more deferential review. We then consider in the alternative whether the Proposition 100 laws violate due process, under *Bell*, *Schall* and *Salerno*, by imposing punishment before trial. To succeed on their facial challenge, the plaintiffs must show that the Proposition 100 laws are unconstitutional in all of their applications. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citing *Salerno*, 481 U.S. at 745); *see also id.* ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate

sweep." (internal quotation marks omitted)); *United States v. Stevens*, 559 U.S. 460, 472 (2010).

### 1.

We first consider whether the Proposition 100 laws satisfy general substantive due process principles.

The governing substantive due process standard is a familiar one. "The Due Process Clause . . . provides heightened protection against government interference with certain fundamental rights and liberty interests," *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997), "forbid[ding] the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest," *Reno v. Flores*, 507 U.S. 292, 302 (1993).

We apply heightened scrutiny here because the Proposition 100 laws infringe a "fundamental" right. *Salerno*, 481 U.S. at 750. The defendants' brief suggests that the Proposition 100 laws do not implicate a fundamental right, because "[b]ail . . . is not a fundamental . . . constitutional right," but *Salerno* made clear that what is at stake here is "the individual's strong interest in liberty," and the Court was careful "not [to] minimize the importance and *fundamental* nature of this right." *Id.* (emphasis added). If there was any doubt about the level of scrutiny applied in *Salerno*, it has been resolved in subsequent Supreme Court decisions, which have confirmed that *Salerno* involved a fundamental liberty interest and applied heightened scrutiny. *See Flores*, 507 U.S. at 301–02; *id.* at 316 (O'Connor, J., concurring); *Foucha v. Louisiana*, 504 U.S. 71, 80–83 (1992);

*id.* at 93 (Kennedy, J., dissenting). *Salerno* and the cases that have followed it have recognized that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha*, 504 U.S. at 80. Thus, "[t]he institutionalization of an adult by the government triggers heightened, substantive due process scrutiny." *Flores*, 507 U.S. at 316 (O'Connor, J., concurring). As the Court explained in *Salerno*, 481 U.S. at 755, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *See also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects."); *Foucha*, 504 U.S. at 90 (Kennedy, J., dissenting) ("As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution."). Thus, the Proposition 100 laws will satisfy substantive due process only if they are "narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 302 (citing *Salerno*, 481 U.S. at 746).[3]

That the Proposition 100 laws regulate persons when there is probable cause to believe they have "entered or remained in the United States illegally," Ariz. Const. art. 2, § 22(A)(4), does not alter the analysis, as the defendants concede. The Due Process Clauses of the Fifth and Fourteenth Amendments protect every person within the

---

[3] At oral argument, the defendants conceded that *Salerno* applied heightened scrutiny and that heightened scrutiny applies here.

nation's borders from deprivation of life, liberty or property without due process of law. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976). "Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Id.*[4]

We also bear in mind that, regardless of whether an arrestee is a citizen, a lawful resident or an undocumented immigrant, the costs to the arrestee of pretrial detention are profound. "Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein*, 420 U.S. at 114. And it may affect "the defendant's ability to assist in preparation of his defense." *Id.* at 123. As the Supreme Court stated in *Stack*, 342 U.S. at 4, the "traditional right to freedom before conviction permits the unhampered preparation of a defense." *See also* ABA Standards for Criminal Justice: Pretrial Release 29 (3d. ed. 2007) (citing "considerable evidence that pretrial custody status is associated with the ultimate outcomes of cases, with released defendants consistently faring better than defendants in detention").

In this case, the defendants argue that the Proposition 100 laws satisfy substantive due process because they serve the state's substantial interest in ensuring that persons accused of crimes are available for trial. They argue that pretrial detention is a constitutionally acceptable means of furthering

---

[4] *See also Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting) ("As persons within our jurisdiction, . . . aliens are entitled to the protection of the Due Process Clause."); *cf. Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

that interest. And they contend that Proposition 100's *categorical* denial of bail to undocumented immigrants, without any individualized determination of flight risk, is justified because undocumented immigrants *in general* pose an unmanageable flight risk. The district court accepted this rationale, concluding that "[t]he Arizona legislature and Arizona voters made the logical assumption that a person who is unlawfully present in the United States may not appear for trial." We disagree.

We do not question that Arizona has a compelling interest in ensuring that persons accused of serious crimes, including undocumented immigrants, are available for trial. *See Salerno*, 481 U.S. at 749 (noting that "an arrestee may be incarcerated until trial if he presents a risk of flight"); *Bell*, 441 U.S. at 534 (recognizing the government's "substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences," and "that confinement of such persons pending trial is a legitimate means of furthering that interest"). The plaintiffs properly conceded this point at oral argument.

We do, however, reject the proposition that the Proposition 100 laws are carefully limited, as *Salerno* requires. *Salerno* concluded that the challenged provisions of the Bail Reform Act satisfied the tailoring requirement of heightened scrutiny because they created a "*narrowly focuse[d]*," "*carefully limited* exception" to the "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 749–50, 755 (emphasis added). The Act thus satisfied the heightened scrutiny standard because Congress had chosen a "*careful delineation* of the circumstances under which detention will be permitted"

rather than adopting a "scattershot attempt" at advancing the government's interest in preventing crime by arrestees. *Id.* at 750–51 (emphasis added).

In holding the Act sufficiently tailored to satisfy heightened scrutiny, *Salerno* focused on three considerations. First, that the challenged provisions addressed "a particularly acute problem." *Id.* at 750. Second, that "[t]he Act operates only on individuals who have been arrested for a specific category of extremely serious offenses," where Congress had "specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest." *Id.* Third, that the Act required "a full-blown adversary hearing" at which the government was required to "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* None of those considerations exist here.

### a. The Proposition 100 Laws Do Not Address a Particularly Acute Problem.

*First*, the record does not support the argument that the Proposition 100 laws addressed "a particularly acute problem." *Salerno*, 481 U.S. at 750. The Bail Reform Act at issue in *Salerno* addressed an "alarming problem of crimes committed by persons on release." *Id.* at 742 (quoting S. Rep. No. 98-225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185) (internal quotation marks omitted). The record in *Salerno* contained empirical evidence establishing that the legislation addressed "a pressing societal problem," *id.* at 747 (citing S. Rep. No. 98-225, at 4–8, 1984 U.S.C.C.A.N. at 3186–91), and the law operated only on individuals "Congress specifically found . . . are far more likely to be

responsible for dangerous acts in the community after arrest," *id.* at 750 (citing S. Rep. No. 98-225, at 6–7, 1984 U.S.C.C.A.N. at 3188–90). This evidence figured prominently in the Court's decision to uphold the Bail Reform Act.

Similarly, in *Demore v. Kim*, 538 U.S. 510 (2003), where the Court upheld a federal immigration statute providing for mandatory detention of certain convicted criminal aliens during the brief period of their civil removal proceedings, the record contained evidence that the legislation addressed a particularly acute problem. The Court emphasized and discussed at length the considerable evidence in the record, much of it quantitative, showing that the legislation applied to persons who were both dangerous and at risk of flight. *See id.* at 518–21, 528.[5]

Here, there is no evidence that the Proposition 100 laws were adopted to address a particularly acute problem. In contrast to *Salerno* and *Demore*, the record contains no findings, studies, statistics or other evidence (whether or not part of the legislative record) showing that undocumented immigrants as a group pose either an unmanageable flight risk or a significantly greater flight risk than lawful residents. The absence of such evidence both distinguishes this case

---

[5] "One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45% – nearly half – were arrested multiple times before their deportation proceedings even began." *Demore*, 538 U.S. at 518. Another study showed that "[o]nce released, more than 20% of deportable criminal aliens failed to appear for their removal hearings." *Id.* at 519. Congress also had empirical evidence that, "even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight." *Id.* at 520; *see also id.* at 528. Such evidence is lacking here.

from *Salerno* and supports the conclusion that Proposition 100 laws are not carefully limited, as they must be to survive heightened scrutiny under *Salerno*.[6]

---

[6] In arguing that Proposition 100 addressed a particularly acute problem, Judge Tallman focuses on two factors: (1) statements made in support of Proposition 100 by then-Maricopa County Attorney Andrew Thomas; and (2) that Arizona voters approved the Proposition by a wide margin. Neither argument is persuasive.

As part of the 2006 campaign in favor of Proposition 100, County Attorney Thomas asserted that "[f]ar too many illegal immigrants accused of serious crimes have jumped bail and slipped across the border in order to avoid justice in an Arizona courtroom." He also told *Lou Dobbs Tonight* that Arizona had a "tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding, and not facing trial for their crimes, either because they jump bail after they are out, or because, when they are let out on bail, the federal government deports them." The record does not substantiate Thomas' claims, however, and he is not a credible source. He was disbarred in 2012 for using his office to destroy political enemies, filing malicious and unfounded criminal charges, committing perjury and engaging in a host of other crimes, and the state bar committee found that he had "outrageously exploited power," "flagrantly fostered fear," "disgracefully misused the law" and "dishonored, desecrated, and defiled" the public trust. *In re Thomas*, No. PDJ-2011-9002 (Before the Presiding Disciplinary Judge of the Supreme Court of Arizona, Apr. 10, 2012) (Opinion and Order Imposing Sanctions), at p. 245, *available at* http://www.azcourts.gov/mediaroom/HighProfileCaseUpdate.aspx (last visited July 10, 2014). Although Judge Tallman relies heavily on Thomas' comments (Dissent at 53–54, 58 & n.4), the defendants tellingly do not even mention them.

That Arizona voters approved Proposition 100 by a large margin (Dissent at 53, 58 & n.5, 59, 61) also does not show that the legislation addressed a particularly acute problem. At most, the vote shows that voters *perceived* a problem, not that one actually existed. Moreover, as discussed below in part III.B.2 and in Judge Nguyen's concurrence, there is substantial evidence that Arizona voters approved Proposition 100 at

Contrary to Judge Tallman's reading of our opinion, we neither "demand" findings, studies, statistics or other evidence showing that undocumented immigrants pose an unmanageable flight risk nor impose an "empirical data requirement" on the defendants. Dissent at 60–61. We do not hold Proposition 100 "void . . . for want of evidence," *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000), but rather that the Proposition 100 laws are not "carefully limited" under *Salerno*. Whether Proposition 100 "narrowly focuses on a particularly acute problem" is part of that inquiry. *Salerno*, 481 U.S. at 750; *see also Foucha*, 504 U.S. at 81. Thus, although we do not require the defendants to produce evidence or point to legislative findings, the absence of any credible showing that the Proposition 100 laws addressed a particularly acute problem is one factor quite relevant to demonstrating that the laws are not carefully limited.

### b. The Proposition 100 Laws Are Not Limited to a Specific Category of Extremely Serious Offenses.

*Second*, the Proposition 100 laws are not limited to "a specific category of extremely serious offenses." *Salerno*, 481 U.S. at 750; *cf. Demore*, 538 U.S. at 517–18, *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997). Instead, they encompass an exceedingly broad range of offenses, including not only serious offenses but also relatively minor ones, such as unlawful copying of a sound recording, altering a lottery ticket with intent to defraud, tampering with a computer with

least in part for reasons other than a perceived problem of flight risk – to punish undocumented immigrants for perceived immigration and criminal violations.

the intent to defraud and theft of property worth between $3,000 and $4,000.

> ### c. The Proposition 100 Laws Do Not Require a Full-blown Adversary Hearing at Which the State Is Required to Prove that an Individual Arrestee Presents an Unmanageable Flight Risk.

*Finally*, even if *some* undocumented immigrants pose an unmanageable flight risk or undocumented immigrants on average pose a greater flight risk than other arrestees, Proposition 100 plainly is not carefully limited because it employs an overbroad, irrebuttable presumption rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk. In *Salerno*, the regulatory scheme was limited to arrestees who actually posed a danger to the community. First, it was limited to "individuals who have been arrested for a specific category of extremely serious offenses" – who Congress found were "far more likely to be responsible for dangerous acts in the community after arrest." *Salerno*, 481 U.S. at 750. Second, even for arrestees falling within that specific category, the scheme provided case-by-case determinations of the need for pretrial detention. Each arrestee was entitled to a "full-blown adversary hearing," at which the government was required to prove by "clear and convincing evidence" that the individual presented "a demonstrable danger to the community" and that "no conditions of release c[ould] reasonably assure the safety of the community." *Id.* It was only "[u]nder these narrow circumstances" that the Court held that society's interest was sufficient to outweigh the "individual's strong interest in [pretrial] liberty." *Id.*

In contrast, Proposition 100 is not narrowly focused on those arrestees who actually pose the greatest flight risk. Demonstrably, many undocumented immigrants are not unmanageable flight risks. The record includes examples of undocumented immigrants who were arrested before Proposition 100, granted bail or released on their own recognizance, and appeared at their court dates and trials. Yet even these individuals were needlessly remanded into state custody following Proposition 100's passage.

In *Hernandez v. Lynch*, 167 P.3d 1264 (Ariz. Ct. App. 2007), for example, police found a social security card and a resident alien card in Hernandez's wallet after arresting him for possessing an open container of alcohol within the passenger compartment of a motor vehicle. *See id.* at 1265. Hernandez admitted that the cards were forged, that he had purchased them for $5,000 and that he had procured them in order to work and buy food. *See id.* at 1266. The state charged him with two counts of knowingly possessing forged instruments with intent to defraud, a class 4 felony. *See id.* He was released on his own recognizance after an initial appearance hearing. When he appeared voluntarily for his preliminary hearing, however, he was automatically denied bail by operation of Proposition 100. *See id.* He ultimately pled guilty to solicitation to commit forgery, a class 6 felony, and was placed on probation for one year. *See id.* Proposition 100 categorically eliminates any opportunity for persons such as Mr. Hernandez to show that, notwithstanding their immigration status, they do not pose a flight risk.

Indeed, it mandates pretrial detention even when the state *concedes* that the arrestee does not pose a flight risk.[7]

Whether a categorical denial of bail for noncapital offenses could ever withstand heightened scrutiny is an open question. *See United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) ("Neither *Salerno* nor any other case authorizes detaining someone in jail while awaiting trial, or the imposition of special bail conditions, based merely on the fact of arrest for a particular crime. To the contrary, *Salerno* . . . upheld the constitutionality of a bail system where pretrial defendants could be detained only if the need to detain them was demonstrated on an individualized basis."). Lawmakers may rely on "reasonable presumptions and generic rules," *Demore*, 538 U.S. at 526; *Flores*, 507 U.S. at 313, when a regulation "involves no deprivation of a 'fundamental' right," *Flores*, 507 U.S. at 311, but "'administrative convenience' is a thoroughly inadequate basis for the deprivation of core constitutional rights," *id.* at 346 (Stevens, J., dissenting); *see Stanley v. Illinois*, 405 U.S. 645, 656–58 (1972). As the defendants conceded at oral argument, irrebuttable presumptions are disfavored.

Thus, at minimum, to survive heightened scrutiny any such categorical rule, requiring pretrial detention in all cases without an individualized determination of flight risk or dangerousness, would have to be carefully limited. The state's chosen classification would have to serve as a

---

[7] Proposition 100, for example, covers foreign citizens who have no legal right to return to their home countries. Conversely, Proposition 100 *excludes* from coverage individuals who would seem *more likely* to flee – such as foreign citizens who are in this country lawfully as tourists and persons having dual citizenship.

convincing proxy for unmanageable flight risk or dangerousness. It has generally been thought, for example, that capital offenses may be made categorically nonbailable because "most defendants facing a possible death penalty would likely flee regardless of what bail was set." *United States v. Kennedy*, 618 F.2d 557, 558-59 (9th Cir. 1980) (per curiam).**[8]**

There is no evidence that undocumented status correlates closely with unmanageable flight risk. The defendants speculate that undocumented immigrants pose a greater flight risk than lawful residents because they supposedly lack strong ties to the community and have a "home" in another country to which they can flee. But this assumption ignores those

---

**[8]** We do not, as Judge Tallman writes, "effectively preclud[e] the use of irrebuttable presumptions in the bail context." Dissent at 62. Rather, we conclude that whether a categorical denial of bail for noncapital offenses could ever withstand heightened scrutiny is an open question, and then assume without deciding that such a rule would be constitutional were it adequately tailored. Our conclusion that this is an open question is clearly correct, given that neither the Supreme Court nor any federal court of appeals has addressed the question. The closest case is *Hunt v. Roth*, 648 F.2d 1148 (8th Cir. 1981), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478 (1982), where the Eighth Circuit held that a provision of the Nebraska Constitution categorically denying bail to persons charged with certain sexual offenses violated the Excessive Bail Clause of the Eighth Amendment because it employed an irrebuttable presumption rather than requiring an individualized determination of flight risk. In language that one might apply here as well, the Eighth Circuit held that "[t]he fatal flaw in the Nebraska constitutional amendment is that the state has created an irrebuttable presumption that every individual charged with this particular offense is incapable of assuring his appearance by conditioning it upon reasonable bail or is too dangerous to be granted release." *Hunt*, 648 F.2d at 1164. *Hunt*, however, was later vacated as moot, so it remains the case that no federal appellate court has yet addressed in a precedential decision whether a categorical denial of bail comports with the Constitution.

undocumented immigrants who do have strong ties to their community or do not have a home abroad.  As our own court's immigration docket reveals, many undocumented immigrants were brought here as young children and have no contacts or roots in another country.  Many have "children born in the United States" and "long ties to the community." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012).  A recent study of undocumented immigrants in California, published by the Center for the Study of Immigrant Integration at the University of Southern California, found that, "contrary to popular misperceptions," undocumented immigrants are "a fairly settled population."  M. Pastor & E. Marcelli, *What's at Stake: Undocumented Californians, Immigration Reform, and Our Future Together* 9 (May 2013), *available at* http://csii.usc.edu/undocumentedCA.html (last visited July 28, 2014).  The researchers found that "nearly 50 percent of undocumented immigrants have been in the country for more than 10 years, and over 17 percent of household heads are homeowners."  *Id.*

Moreover, although the defendants consistently refer to undocumented immigrant arrestees as "flight risks," the pertinent inquiry is whether the arrestee is an *unmanageable* flight risk.  There are a variety of methods to manage flight risk, such as bond requirements, monitoring and reporting requirements.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-3967(D).  Proposition 100 completely ignores these tools for managing flight risk, instead mandating incarceration in every case.

Before Proposition 100 passed, Arizona had an extensive bail scheme designed to help ensure that arrestees appear for trial.  *See* Ariz. Const. art. 2, § 22(A)(3); Ariz. Rev. Stat. Ann. § 13-3967(B).  These procedures already required judges to consider factors such as "[t]he accused's family

ties, employment, financial resources," "length of residence in the community," "[w]hether the accused has entered or remained in the United States illegally" and "[w]hether the accused's residence is in this state, in another state or outside the United States." Ariz. Rev. Stat. Ann. § 13-3967(B)(4), (8), (11)–(12). There is no evidence that this set of regulations, addressing flight risk on a case-by-case basis, was inadequate to protect the state's compelling interest in ensuring undocumented immigrant arrestees' appearance at trial. *Cf. Demore*, 538 U.S. at 520, 528 (noting that Congress chose a mandatory detention rule only after evidence showed that individualized screening had failed to address the problem of convicted criminal detainees in large numbers failing to appear at their removal hearings). Furthermore, Arizona added the last two of these considerations – "[w]hether the accused has entered or remained in the United States illegally" and "[w]hether the accused's residence is in this state, in another state or outside the United States," Ariz. Rev. Stat. Ann. § 13-3967(B)(11)–(12) – only in June 2006, a few months before Proposition 100 was submitted to the state's voters. *See* 2006 Ariz. Legis. Serv. Ch. 380 (H.B. 2580) (West). Arizona gave these provisions no chance to succeed before resorting to mandatory detention in every case. Thus, although Judge Tallman's dissent asserts that individualized assessments of flight risk have been tried and failed (Dissent at 53, 62, 65), neither assertion is borne out by the record.

The Proposition 100 laws also do not reflect a "widely shared legislative judgment." *Schall*, 467 U.S. at 272. The federal criminal justice system does not categorically deny bail to undocumented immigrant arrestees. *See generally*

18 U.S.C. § 3142; *see id.* § 3142(d).**⁹** Most states that categorically prohibit bail at all do so only for capital offenses**¹⁰** or for other very serious crimes.**¹¹** Other than

---

**⁹** Pre-adjudication eligibility for bail is also the norm in federal removal proceedings. *See* 8 U.S.C. § 1226(a). Federal law mandates detention during removal proceedings only for "a limited class of deportable aliens – including those convicted of an aggravated felony." *Demore*, 538 U.S. at 517–18; *see* 8 U.S.C. § 1226(c).

**¹⁰** *See* Ala. Const. art. I, § 16; Alaska Const. art. I, § 11; Ark. Const. art. 2, § 8; Cal. Const. art. I, § 12; Colo. Const. art. II, § 19; Conn. Const. art. I, § 8; Del. Const. art. I, § 12; Idaho Const. art. I, § 6; Kan. Const. Bill of Rights § 9; Ky. Const. § 16; La. Const. art. I, § 18; Me. Const. art. I, § 10 (current or former capital offenses nonbailable); Minn. Const. art. I, § 7; Miss. Const. art. 3, § 29; N.J. Const. art. I, ¶ 11; N.D. Const. art. I, § 11; Ohio Const. art. I, § 9; Okla. Const. art. 2, § 8; Tenn. Const. art. I, § 15; Tex. Const. art. I, § 11; Wash. Const. art. I, § 20; Wyo. Const. art. 1, § 14.

**¹¹** *See* Fla. Const. art. I, § 14 (capital offenses and offenses punishable by life imprisonment nonbailable); Ill. Const. art. I, § 9 (capital offenses and offenses punishable by life imprisonment nonbailable); Ind. Const. art. 1, § 17 (murder and treason nonbailable); Md. Code Ann., Crim. Proc. § 5-202 (prohibiting pretrial release for an arrestee charged with escaping from a correctional facility); Mass. Gen. Laws ch. 276, § 20D (capital offenses and offenses punishable by life imprisonment nonbailable); Mich. Const. art. I, § 15 (murder, treason, repeat violent felonies and felonies committed while out on bail, probation or parole for a prior violent felony nonbailable); Neb. Const. art. I, § 9 (murder, treason and serious sexual offenses nonbailable); Nev. Const. art. 1, § 7 (capital offenses or murders punishable by life imprisonment without possibility of parole nonbailable); N.H. Rev. Stat. Ann. § 597:1-c (offenses "punishable by up to life in prison" nonbailable); N.M. Const. art. II, § 13 (capital offenses and certain repeat felony offenders nonbailable); Or. Const. art. I, § 14 (murder and treason nonbailable); Pa. Const. art. I, § 14 (capital offenses or offenses punishable by life imprisonment nonbailable); R.I. Const. art. I, § 9 (offenses punishable by life imprisonment, offenses involving dangerous weapons by arrestees previously convicted of other offenses and certain controlled substance offenses nonbailable); S.C. Const. art. I,

Arizona, only Missouri singles out undocumented immigrants for the categorical denial of bail. *See* Mo. Ann. Stat. § 544.470(2).[12] The American Bar Association's Standards for Criminal Justice do not make any offenses categorically nonbailable. They provide that "only defendants charged with dangerous or violent crimes or, in certain cases, with other serious crimes, may even be considered for detention," and they state that "[a] decision to detain should be made only upon a clear showing of evidence that the defendant poses a danger to public safety or a risk of non-appearance that requires secure detention." ABA Standards for Criminal Justice: Pretrial Release 35, 51 (3d ed. 2007).

In an attempt to establish that the Proposition 100 laws satisfy due process, the defendants rely heavily on *Demore v. Kim*. This reliance is misplaced. *Demore* did uphold a categorical denial of bail without an individualized determination of flight risk or dangerousness for certain

---

§ 15 (capital offenses, offenses punishable by life imprisonment and certain violent offenses nonbailable); Utah Const. art. I, § 8 (capital offenses and felony offenses committed while out on bail, probation or parole for prior felony offense nonbailable).

[12] Alabama formerly categorically denied bail to undocumented immigrants as well, *see* Ala. Code § 31-13-18(b), but the state has concluded that § 31-13-18(b) violates the Alabama Constitution, and the law is no longer in force. *See* Dismissal Order and Stipulated Permanent Injunction, *Hispanic Interest Coal. of Alabama v. Bentley*, No. 5:11-CV-2484-SLB (N.D. Ala. Nov. 25, 2013), at 2 n.4 ("The State Defendants further represent that in light of Article 1, Section 16, of the Alabama Constitution, they understand that Section 19(b) of H.B. 56 (Ala. Code § 31-13-18(b)) can only be applied to deny bail to persons arrested for a capital crime, and cannot be applied to deny bail to individuals arrested for or charged solely with non-capital crimes, regardless of their immigration status.").

convicted criminal aliens briefly detained during their civil deportation proceedings. *Demore*, however, applied rational basis review, not heightened scrutiny, because it involved federal regulation of immigration. *See Demore*, 538 U.S. at 521–28. Such regulations have to meet only "the (unexacting) standard of rationally advancing some legitimate governmental purpose," *Flores*, 507 U.S. at 306; *see also Fiallo v. Bell*, 430 U.S. 787, 793 (1977); *Mathews*, 426 U.S. at 79–80, not the heightened scrutiny required under *Salerno*. *Demore*, moreover, involved a class of detainees who had already been convicted of serious crimes, *see* 538 U.S. at 513, a "very limited" period of detention, *id.* at 529–30 & n.12, and extensive evidence and findings establishing the need for the policy, *see id.* at 513, 518–20, 528.

In sum, we hold that the Proposition 100 laws do not satisfy the heightened substantive due process scrutiny *Salerno* requires. Although the state has a compelling interest in assuring that arrestees, including undocumented immigrants, appear for trial, Proposition 100 is not carefully limited to serve that interest.

We further hold that the laws are facially unconstitutional. *See Wash. State Grange*, 552 U.S. at 449. Because Proposition 100 is not "carefully limited" as *Salerno*'s heightened scrutiny test requires, "the *entire statute* fails [*Salerno*'s] decision rule and would thus be invalid in all of its applications." Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto*, 98 Va. L. Rev. 301, 331 (2012) (emphasis added). Even persons who could be detained consistent with due process under a different categorical statute, or who would be detained under Proposition 100 if it afforded an individualized determination, could successfully challenge

the Proposition 100 laws on the same grounds relied on in our opinion, namely, failure to provide either a valid categorical exclusion from bail or an individualized determination. *See Foucha*, 504 U.S. at 80–83 (invalidating in toto a statute that categorically required commitment of all people found not guilty by reason of insanity as a violation of substantive due process (citing *Salerno*, 481 U.S. at 747–51, 755)); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 376 (2010) (Roberts, C.J., concurring) (explaining that facial invalidation is appropriate when, "[g]iven the nature of th[e] claim and defense, . . . any other [plaintiff] raising the same challenge would also win"); Keller & Tseytlin, *supra*, at 322 ("[E]very person has the right not to be subject to an unconstitutional law – that is, a law that violates a textual decision rule.").[13] There exists, therefore, "'no set of circumstances . . . under which [the Proposition 100 laws] would be valid.'" *Wash. State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745).

---

[13] Keller and Tseytlin explain that "the Supreme Court has created various constitutional decision rules to enforce the Constitution's provisions and constrain lower courts as they adjudicate constitutional disputes." Keller & Tseytlin, *supra*, at 320. The authors identify "two broad categories of decision rules: textual decision rules and enforcement decision rules." *Id.* at 322. Textual decision rules "require courts to examine the statutory text enacted by the legislature or the circumstances surrounding that text's enactment." *Id.* Enforcement decision rules, by contrast, "direct courts to examine the particular facts surrounding the executive's or the judiciary's enforcement of a statute instead of the statutory text itself." *Id.* at 324. *Salerno*'s heightened scrutiny substantive due process test, which we apply here, is a textual decision rule, and application of such a rule will lead to in toto invalidation where, as here, "the litigants' arguments and the courts' inquiries focused on the entire statutory coverage." *Id.* at 339.

Furthermore, the Proposition 100 laws have been fully implemented, so there is no possibility that Arizona or Maricopa County will implement them in a narrower, constitutional manner, *cf. Wash. State Grange*, 552 U.S. at 450, and the defendants have not suggested any "reasonable" or "readily apparent" narrowing construction that would make the laws constitutional, *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)) (internal quotation marks omitted)). Accordingly, the laws are facially unconstitutional.

## 2.

We next consider whether the Proposition 100 laws violate substantive due process by imposing punishment before trial. *See Salerno*, 481 U.S. at 746. "To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent." *Id.* at 747. "Unless [the legislature] expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (alterations and internal quotation marks omitted).

To discern legislative intent, the district court considered both (1) the legislative record before the Arizona legislature that passed and referred Proposition 100 to the voters and (2) statements made during the referendum drive and in election materials. The court concluded that the legislative record "suggests that Proposition 100 may have been motivated by a desire to punish for past crimes, but there is also evidence that legislators considered the issue of flight

risk." Similarly, the court concluded that the "voter materials contained some official statements reflecting a punitive purpose, but ultimately the message was mixed." And the court ultimately concluded that "the record as a whole does not support a finding that Proposition 100 was motivated by an improper punitive purpose." Given the mixed nature of the evidence of legislative and voter intent, and the difficulty in attributing motives to the electorate, we see no reason to revisit those conclusions on appeal. By assuming without deciding that Proposition 100 does not have a punitive purpose, however, we do not minimize the considerable evidence of punitive intent found in this record.[14] There is

---

[14] A partial summary of that evidence: State Representative Russell Pearce, the bill's sponsor, stated that Proposition 100 "just simply bridges the gap, a loophole in the law that would allow people who are not in this country [ ]legally who have no business to be released if they commit any crime, they have no business being released if they commit no crime, no additional crime [be]cause they're already in this country illegally." *Senate Judiciary Committee Meeting on H.B. 2389 and HCR 2028*, 47th Leg., 1st Regular Sess. (Ariz. 2005). Said Pearce, "[B]ad enough you're illegal but you commit a serious crime you ought not to be bondable." *Id.* He added: "[T]his bill targets very simply those who commit serious, serious [criminal] acts in our community. A very responsible bill to protect our citizens from those who would enter our country illegally and commit serious crimes against us . . . ." *Id.* Rep. Pearce promoted the bill on the ground that "all illegal aliens in this country ought to be detained, debriefed and deported." *Id.* He reiterated: "If you're in this country illegally you ought to be detained [and] deported[.] [E]nd of story," and he defended the bill as a "reasonable approach" to border security. *Id.* State Representative Ray Barnes expressly promoted the bill on the assumption that "the mere fact that they're here undocumented [means] that the crime has already been committed." *House Judiciary Committee Meeting on H.B. 2389*, 47th Leg., 1st Regular Sess. (Ariz. 2005). State Senator Jack Harper said, "what part of illegal don't we understand? Illegal aliens shouldn't be able to get bond for anything." *Senate Judiciary Committee Meeting on H.B. 2389 and HCR 2028*, 47th Leg., 1st Regular Sess. (Ariz. 2005). In a hearing on a bill to implement

strong evidence that Proposition 100 was motivated at least in significant part by a desire to punish undocumented immigrants for (1) entering and remaining in the country without authorization and (2) allegedly committing the charged offense.[15]

Nevertheless, assuming that Proposition 100 was adopted for the permissible regulatory purpose of managing flight risk, "the punitive/regulatory distinction turns on whether" Proposition 100 "appears excessive in relation to the alternative purpose assigned to it." *Salerno*, 481 U.S. at 747 (alterations and internal quotation marks omitted). As discussed earlier, *Salerno* held that the Bail Reform Act was not excessive where it addressed a "pressing societal

Proposition 100 after its passage, State Representative John Kavanagh said: "I'm amazed that we provide bail to anybody who's arrested for a crime that's an illegal alien . . . . I therefore support this bill as a first step to what we should be really doing and that's deporting anybody here illegally." *House Floor Meeting on S.B. 1265*, 48th Leg., 1st Regular Sess. (Ariz. 2007).

[15] Denying an arrestee bail for either of these reasons would be impermissible. Being present in the United States without authorization is not a crime, *see Arizona v. United States*, 132 S. Ct. at 2505 ("As a general rule, it is not a crime for a removable alien to remain present in the United States."), and even if it were, only the federal government would be permitted to impose punishment for it, *see id.* at 2509 ("[I]t would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision."). And bail could not be denied to punish arrestees for their charged, but unproven, crimes. *See Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a [defendant] may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Salerno*, 481 U.S. at 746 (citing *Bell* for the proposition that pretrial detention violates substantive due process when it constitutes "impermissible punishment before trial").

problem," "carefully limit[ed] the circumstances under which detention may be sought to the most serious of crimes" and entitled the arrestee to "a prompt detention hearing" at which an individualized determination of dangerousness was required. *Id.* By contrast, Proposition 100 is excessive in relation to its stated legitimate purpose because it purports to deal with a societal ill – unmanageable flight risk posed by undocumented immigrants as a class – that has not been shown to exist. Even if we assume that a problem exists, Proposition 100 employs a profoundly overbroad irrebuttable presumption, rather than an individualized evaluation, to determine whether an arrestee is an unmanageable flight risk. As discussed, this mechanism necessarily results in the deprivation of liberty even where not necessary to ensure appearance at trial, because undocumented immigrants who do not pose a flight risk or who pose a manageable one are categorically denied bail based solely on their status. Given this *severe* lack of fit between the asserted nonpunitive purpose and the actual operation of the law, we conclude that Proposition 100's bail provisions are punitive rather than regulatory. Thus, the Proposition 100 laws facially violate substantive due process by imposing punishment before trial.

## IV.

To conclude, Proposition 100 categorically denies bail or other pretrial release and thus requires pretrial detention for every undocumented immigrant charged with any of a broad range of felonies, regardless of the seriousness of the offense or the individual circumstances of the arrestee, including the arrestee's strong ties to and deep roots in the community. The defendants maintain that this unusual, sweeping pretrial detention statute, directed solely at undocumented immigrants, comports with substantive due process. It does

not. The Supreme Court has made clear that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. The "narrowly focuse[d]" pretrial release statute upheld in *Salerno* provided a "careful delineation of the circumstances under which detention will be permitted." *Id.* at 750–51. In contrast, the Proposition 100 laws do not address an established "particularly acute problem," are not limited to "a specific category of extremely serious offenses," and do not afford the individualized determination of flight risk or dangerousness that *Salerno* deemed essential. *Id.* at 750. These laws represent a "scattershot attempt" at addressing flight risk and are not narrowly tailored to serve a compelling interest. *Id.* In addition, and for the same reasons, the challenged laws are excessive in relation to the state's legitimate interest in assuring arrestees' presence for trial. They therefore impermissibly impose punishment before an adjudication of guilt. For these reasons, we hold that the Proposition 100 laws violate the substantive component of the Due Process Clause of the Fourteenth Amendment on these two independent grounds. Because we hold that the laws facially violate substantive due process, we do not reach the plaintiffs' procedural due process, Eighth Amendment, Sixth

Amendment and preemption claims.**[16]**  The judgment of the district court is reversed.

### REVERSED AND REMANDED.

---

NGUYEN, Circuit Judge, concurring:

I agree with the majority that Proposition 100 violates substantive due process.  However, the majority assumes, without deciding, that Proposition 100 was *not* motivated by an improper punitive purpose.  I write separately to address the extraordinary record of legislative intent, which I believe demonstrates that Proposition 100 was intentionally drafted to punish undocumented immigrants for their "illegal" status, even if they pose no flight risk or danger to the community.  This record also sheds light on why the law's provisions are excessive in so many respects.  Acknowledging the improper

---

**[16]** We disagree with Judge O'Scannlain's argument that the Proposition 100 laws must be evaluated under the Excessive Bail Clause of the Eighth Amendment rather than the substantive component of the Due Process Clause of the Fourteenth Amendment.  Dissent at 66–70.  The Supreme Court applied substantive due process review to bail-denial schemes in *Salerno* and *Schall*.  Judge O'Scannlain would distinguish those cases on the ground that they involved the denial of bail for dangerousness rather than flight risk, but the Supreme Court has never recognized – or even suggested – that distinction.  *See, e.g.*, *Zadvydas*, 533 U.S. at 690 (citing *Salerno* as setting out the general standard for detention in criminal cases); *Foucha*, 504 U.S. at 83 (citing *Salerno* as setting out the general standard for the "pretrial detention of arrestees").  As Judge O'Scannlain recognizes, Dissent at 71, the parties also have not "thorough[ly] brief[ed]" the Eighth Amendment issues.  For these reasons, we properly rely on substantive due process rather than the Eighth Amendment to address Proposition 100's constitutionality.

legislative purpose in this case not only aids our substantive due process analysis, but also reaffirms our constitutional commitment to provide due process to all, regardless of immigration status.

# I

The Supreme Court has instructed that "[t]o determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent." *United States v. Salerno*, 481 U.S. 739, 747 (1987) (citing *Schall v. Martin*, 467 U.S. 253, 269 (1984)). Absent evidence of express intent to punish, the analysis depends on whether the restrictions are reasonably connected to a legitimate purpose, and whether they appear excessive in relation to that purpose. *Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979); *Salerno*, 481 U.S. at 747. However, whether a statute is intended as punitive, or excessive in relation to some legitimate purpose, are not analytically distinct inquiries. One informs the other:

> Thus, if a particular restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell*, 441 U.S. at 539 (footnote omitted). Conceptually, this makes sense. Because the ultimate question is whether or not

a statute constitutes impermissible punishment, we may consider both what legislators had to say about the law they crafted, and the extent to which the law was drawn accordingly.

Significantly, "the mere invocation of a legitimate purpose will not justify particular restrictions and conditions of confinement amounting to punishment." *Schall*, 467 U.S. at 269. Even if the restrictions "serve legitimate regulatory purposes, it is still necessary to determine whether the terms and conditions of confinement under [the challenged statute] are in fact compatible with those purposes." *Id.* (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

These inquiries do not lend themselves to a rigid, formulaic approach. Rather, "each case has turned on its own highly particularized context." *Flemming v. Nestor*, 363 U.S. 603, 616 (1960). Where the record of legislative intent is inconclusive, the Supreme Court has not hesitated to consider—rather expansively, in fact—the nature and history of the restraint, among other factors. *Mendoza-Martinez*, 372 U.S. at 168–69. *See also Bell*, 441 U.S. at 538 ("The factors identified in *Mendoza-Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word.").

The facts of this case illustrate precisely why legislative intent and tailoring have been considered two sides of the same coin. I therefore turn to some of the record evidence that informs my judgment regarding the unconstitutionality of Proposition 100.

## II

### A

Proposition 100 was sponsored by former State Representative Russell Pearce. Introducing the bill to the Senate Judiciary Committee, Representative Pearce noted that a majority of Americans "want the border secured, [and] our laws enforced," and described Proposition 100 as a "very reasonable approach" to accomplishing those ends.[1] *Senate Judiciary Committee Meeting on H.B. 2389 and H.C.R. 2028*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). He described the purpose of Proposition 100: "[W]hen people are in this country illegally and they commit a serious felony they ought not to be bondable . . . ." *Id.* Although he alluded generally to the supposed dangers that "violent aliens" pose to the public, he did not cite a single example or any other evidence of the problem,[2] and instead elaborated:

---

[1] According to Pearce, Proposition 100 was originally part of a package of legislation intended to "secure the borders." The package also included: the Fair and Legal Employment Act, Ariz. Rev. Stat. § 23-212, which imposes penalties on employers for hiring undocumented immigrants; Proposition 102, Ariz. Const. art. II, § 35, a constitutional amendment to deny undocumented immigrants standing to recover in civil suits; Proposition 103, Ariz. Const. art. XXVIII, § 2, declaring English as the official language of Arizona; and Proposition 300, Ariz. Rev. Stat. §§ 15-191.01, 15-232, 15-1803, 15-1825, 46-801, 46-803, which prohibits undocumented aliens from receiving child care assistance, and those enrolled in public community colleges and universities from receiving the benefit of in-state tuition rates and financial aid, or participating in adult education classes.

[2] The record reflects that Proposition 100's sponsors and supporters also presumed that undocumented immigrants are *categorically* more dangerous than other arrestees. In these proceedings, however, appellees

I mean, you know bad enough you're illegal but you commit a serious crime you ought not to be bondable unless you're released after prosecution, after you do your time to ICE and then to be deported. In fact, all illegal aliens in this country ought to be detained, debriefed, and deported . . . .

*Id.* He continued:

Violent criminals in our society who, again, may not be brought to justice if they're released and should not be released first of all, according to federal law, but they're to be deported, so seriously, they've committed [a] serious crime, I think that this just simply bridges the gap, a loophole in the law that would allow people who are not in this country [ ]legally who have no business to be released if they commit any crime, *they have no business being released if they commit no crime, no additional crime [be]cause they're already in this country illegally*.

*Id*. (emphasis added). Maricopa County Attorney Andrew Thomas, whose office played a central role in drafting Proposition 100, also testified before the Committee. Thomas explained the purpose of the bill as follows:

I believe it is time to end the first class tickets that we have been giving from our jails for

---

have wisely abandoned this premise because it is completely unsubstantiated.

> serious criminals. . . . [C]ertain serious
> criminals currently enjoy this simply because
> of their status as illegal immigrants and I
> believe that we need to take action to put an
> end to this.

*Id.* In his testimony, Thomas, much like Representative Pearce, alluded to "numerous examples of serious and violent criminals that Maricopa County Attorney's Office has prosecuted in the past that have escaped justice"—but also could not cite a single case to support his position.[3] Testifying later in these proceedings, Thomas again could not identify a single such case, and further conceded that his office did not possess any data or information illustrating the problem.

During the same Judiciary Committee hearing, State Senator Bill Brotherton raised concerns about the breadth of the bill. Senator Brotherton gave an example—a student who overstayed his or her visa and was charged with pirating music online would automatically be denied bail, even though a judge might not consider such a defendant a flight risk. *Senate Judiciary Committee Meeting on H.B. 2389 and H.C.R. 2028*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). Representative Pearce dismissed this concern

---

[3] The only specific case Thomas discussed was that of Oscar Garcia Martinez, who, according to Thomas, was released on bail, and *deported by the federal government*, rendering him unavailable to the state. *Id*. Sometime later Martinez apparently reentered, and was present at a confrontation that resulted in the shooting of a police officer by a third party. *Id*. However troubling Martinez's case may be, it certainly does not demonstrate that undocumented immigrants pose a greater flight risk, given that it was the federal government that rendered Martinez absent.

as an attempt to "muddy the waters," *id.*, and reiterated the intent of the bill:

> The fact that we would continue to try to put some veil over what's really happening and try to paint this face of this poor student who overstays his visa, everybody knows what this is targeting.  This is, you know, and my issue is very simple.  This bill doesn't go as far as it ought to go.  This is a very modest bill.  If you're in this country illegally you ought to be detained, deported[,] end of story.

*Id*.  Similarly, when Senator Brotherton expressed his concern that altering a lottery ticket ought not to be a non-bondable offense, State Senator Jack W. Harper interjected:

> *To that point, what part of illegal don't we understand?  Illegal aliens shouldn't be able to get bond for anything let alone a Class 1, 2, or 3 felony. . . .* We need to just get off the subject of lottery ticket[s] because fraudulently altering lottery tickets is a crime and *they shouldn't make bail for anything*, so let's just move on.

*Id.* (emphases added).  Ultimately, the Committee amended the legislation to specify that, should the ballot measure pass, the Legislature would reserve to itself the task of defining "serious felony offense."  To that end, Representative Pearce introduced legislation that would define "serious felony offense" as entailing any class 1, 2, 3, or 4 felony, as well as aggravated driving under the influence. *House Floor Meeting on H.B. 2580*, Mar. 7, 2006, 47th Leg., 2nd Regular Sess.

(Ariz. 2006).    That bill was eventually passed by the Legislature, and signed into law.

Months later, Proposition 100 was referred to the state's voters.  The ballot materials did not inform voters of the definition of "serious felony offense," or that it included many non-violent offenses.  Instead, in a statement of support on the ballot, Representative Pearce warned voters of "[l]arge, well-organized gangs of illegal aliens," and the need to keep such "dangerous thugs in jail rather than releasing them onto the streets."  Publicity Pamphlet Issued by Janice K. Brewer, then-Arizona Secretary of State, Ballot Propositions & Judicial Performance Review, General Election, Nov. 7, 2006, *available at* http://www.azsos.gov/ election/2006/info/pubpamphlet/english/Prop100.htm. Maricopa County Attorney Thomas urged voters[4]:

> Thanks to an amendment approved overwhelmingly by voters in 2002, the Arizona Constitution now denies bail to defendants accused of rape and child molestation. This proposition similarly would deny bail to illegal immigrants who pose a clear danger to society and who too often use

---

[4] Thomas also claimed: "Other examples of illegal immigrants who made bail and avoided prosecution for serious crimes include accused child predators, armed robbers, drug dealers and other accused criminals." *Id.*  The only example Thomas provided, however, was the case of Oscar Martinez.  *See supra* at note 3.  And, as another legislator later correctly noted, "[t]hose individuals who are accused of committing heinous crimes [such as those cited by Proposition 100's supporters] are already denied bail under current state statutes . . . ."  *House Floor Meeting on S.B. 1265*, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007) (statement of Rep. Krysten Sinema).

our border as an escape route. Our state constitution was not intended to "bail out" illegal immigration. I urge you to vote yes to end this abuse of our criminal justice system.

*Id.* Don Goldwater, a gubernatorial candidate, placed this statement on the ballot:

I commit to you that, as your Governor, I will apply all legal measures to protect and defend Arizonans from the illegal invasion. This Ballot Measure addresses one area that needs to be resolved in this fight to secure our borders and reduced the level of crime in our neighborhoods.

It is embarrassing to have our state lead the nation in crime. Unfortunately, the current governor has vetoed ten separate bills sent to her desk the legislature that were written to protect you from illegal immigration.

*Id.* By contrast, the sole statement of opposition to Proposition 100, signed by several individuals, cautioned:

Prop 100 would . . . create a sub-class of people within the justice system based solely on race or national origin, and unnecessarily penalize people who pose little or no risk to the community. This proposition would do nothing more than institutionalize bias and

> discrimination in the justice system, at
> taxpayer expense.

*Id.* Voters approved the constitutional amendment.

After the popular vote, follow-on legislation was introduced that would have lowered the standard of proof applicable to the determination of immigration status from "proof evident and presumption great," to "preponderance of the evidence." Pearce rose on the floor of the House to oppose the bill because, in his view, it did not lower the standard even further, to "probable cause." In his opposition, Pearce repeatedly emphasized the immigrants' "illegal" status:

> You don't need to make that kind of a
> standard for preponderance or anything else to
> the charge[,] they are here illegally . . . . they
> are here illegally, they have no business being
> released no [matter] what the charge in reality
> because they're a flight risk. They're here
> illegally. They need to be turned over to ICE
> . . . .

*House Floor Meeting on S.B. 1265*, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). Representative John Kavanagh raised similar arguments. *Id.* Ultimately, the measure to set the burden of proof at "preponderance of the evidence" failed. Days later, discussing an amendment to lower the standard to "probable cause," Representative Kavanagh explained his support for the latter:

> I'm amazed that we provide bail to anybody
> who's arrested for a crime that's an illegal

alien. I think anybody, regardless if it's serious or a minor crime[,] should be denied bail . . . . We should deny bail to anybody here illegally who's picked up. I therefore support this bill as a first step to what we should be really doing and that's deporting anybody here illegally.

*House Floor Meeting on S.B. 1265*, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). The amendment lowering the standard of proof to "probable cause" passed.

While this is by no means an exhaustive survey of the evidence of punitive intent to be found in the record, the foregoing summary at least conveys the tenor of the legislative debates and ballot materials. The hostility directed toward undocumented immigrants based solely on their status could not be more obvious.

## B

I acknowledge, of course, that there are references in the record to flight risk—indisputably, a legitimate objective of regulation, *Salerno*, 481 U.S. at 749; *Bell*, 441 U.S. at 534—and more specifically, the unsupported premise that undocumented immigrants inherently pose a greater flight risk than other arrestees.[5] But there is nothing unusual about

---

[5] For example, in one exchange, Representative Pearce asked: "[W]ouldn't you agree that somebody that's not in this country legally probably is a greater flight risk than somebody who is, who has roots here and is a citizen here?" *House Floor Meeting on S.B. 1265*, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). State Representative Pete Rios, who previously served as the first Latino president of Arizona's State Senate, responded: "I know of some people in this country who don't have

a "mixed" legislative record; legislators and voters often take positions for diverse reasons.

Indeed, the very concept of legislative intent can be "elusive," *Mendoza-Martinez*, 372 U.S. at 168, and

> [j]udicial inquiries into [legislative] motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.  Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it.

*Flemming*, 363 U.S. at 617.  But recognizing the perils of second-guessing legislative intent does not relieve us of the responsibility to ascertain the law's purpose, particularly here because, in my view, the overriding legislative intent is so apparent.  *See Salerno*, 481 U.S. at 747 (in evaluating restrictions on liberty, "we first look to legislative intent").

That there are references to flight risk, as noted by the dissent, illustrates why the Supreme Court has prescribed a mutually-reinforcing, twin-pronged framework for analysis. *See Bell*, 441 U.S. at 539.  To the extent there is any doubt about the purpose of Proposition 100, the statements in the

---

proper documentation that probably have deeper roots in the state of Arizona than I do.  They've been here for a couple of generations, they've got grandkids, so I mean that, in itself, I think does not determine whether or not one is a flight risk."  *Id.*

legislative record further support the conclusion, consistent with the majority's analysis of its various provisions, that the law was intended as punishment.

This principle rings true at a general level—naturally, the law's drafting and design sheds light on its purpose, and vice versa—but it also informs my analysis of the law's specific provisions. For example, a number of Proposition 100's excesses, including the evident overbreadth of the critical term "serious felony offense," were pointed out to the bill's sponsors in Committee. As noted above, Senator Brotherton drew attention to the specific examples of illegal downloading and alteration of a lottery ticket to emphasize the law's excessive reach. *See Senate Judiciary Committee Meeting on H.B. 2389 and H.C.R. 2028*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). Yet, Proposition 100's sponsors declined to narrow the definition of covered "serious felonies," which renders "an exceedingly broad range of offenses" non-bondable. Maj. Op. at 23. Why Senator Brotherton's concerns regarding Proposition 100's excessiveness were brushed aside is plain from the record—because, as expressed by the bill's supporters, "illegal aliens" "shouldn't make bail for anything." *Senate Judiciary Committee Meeting on H.B. 2389 and H.C.R. 2028*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). The legislative debate over the standard of proof is also illustrative. Statements such as, "I'm amazed that we provide bail to anybody who's arrested for a crime that's an illegal alien," *House Floor Meeting on S.B. 1265*, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007), strongly suggest that the standard of proof was lowered in order to target undocumented immigrants as such, without respect to flight risk.

I agree with the majority that we do not affirmatively require formal legislative findings or other evidence, yet may find the absence of such a record to be significant.[6] Maj. Op. at 23. I also readily acknowledge that there may be many cases where the mixed record renders legislative intent too elusive, or otherwise unknowable. This case, however, is not one of them. Intentionally meting out pretrial punishment for charged but unproven crimes, or the nonexistent crime of being "in this country illegally,"[7] is without question, a violation of due process principles. *Mendoza-Martinez*, 372 U.S. at 167; *Bell*, 441 U.S. at 539.

### III

"[I]t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts considered to be void," *Fletcher v. Peck*, 6 Cranch 87, 128 (1810) (Marshall, C.J.), and I do not reach that conclusion lightly. However, the unequivocal expressions of penal intent in the record, viewed together with the excesses of the law's various provisions, lead me to conclude that Proposition 100 is facially unconstitutional.

---

[6] Nobody disputes that there is no such evidence in the record. The dissent observes that undocumented immigrants reportedly commit a disproportionate share of felonies in Arizona. Tallman dissent at 59 (citing *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012)). But even assuming that is true, it does not suggest undocumented immigrants overall are more *likely to flee* than other arrestees, nor does it shed light on the flight risk posed by any given individual defendant.

[7] The majority correctly points out that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2505.

TALLMAN, Circuit Judge, with whom Circuit Judge O'SCANNLAIN joins, dissenting:

In striking down Proposition 100, the majority sets aside the policy judgment of the Arizona legislature and nearly 80 percent of Arizona's voting electorate, telling the State it really doesn't have an illegal immigration problem adversely affecting its criminal justice system. But Arizonans thought Proposition 100 was the solution to an ineffective bail system that was letting too many illegal aliens avoid answering for their serious felony charges. They were concerned that these offenders, who often lack community ties, too often skirt justice by fleeing the state or the country before trial. Plaintiffs-Appellants Lopez-Valenzuela and Castro-Armenta are good examples. Between the two of them they were charged with aggravated assault with a deadly weapon, kidnapping, theft by extortion, assisting a criminal syndicate, and transportation of a dangerous drug.

Today's holding leaves Arizona nowhere to turn. For years before Arizona passed Proposition 100, it tried to assess flight risk based on family ties, employment, and length of residency in the community on an individualized basis. Immigration status was assuredly a critical consideration in this assessment, even well before Proposition 100's enactment. The majority ignores reality to suggest otherwise. Yet despite these individualized flight-risk assessments, the Maricopa County Attorney explained in 2006 that Arizona still had a "tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding, and not facing trial for their crimes." *Lou Dobbs Tonight* (CNN television broadcast Oct. 13, 2006). Faced with this continuing problem, Arizona took a logical next step by denying bail to illegal aliens who commit serious felony

offenses. Because Proposition 100 is not excessive in relation
to Arizona's compelling regulatory interest in ensuring that
illegal aliens who commit serious felony offenses stand trial,
I respectfully dissent.

# I

## A

The majority's errors begin with its substantive due
process framework. It applies what it calls "*Salerno*'s
heightened scrutiny" to Proposition 100. Maj. Op. at 15; *see*
*United States v. Salerno*, 481 U.S. 739 (1987). Under this
test, it says, the law survives only when it is "narrowly
tailored to serve a compelling state interest." Maj. Op. at 17.
This is strict scrutiny. *See, e.g.*, *Green v. City of Tucson*, 340
F.3d 891, 896 (9th Cir. 2003) (Fisher, J.) (Under "strict
scrutiny," "the statute will be upheld only if the state can
show that the statute is narrowly drawn to serve a compelling
state interest."). However, you will not find strict scrutiny
mentioned, let alone applied, anywhere in *Salerno*.[1]

The majority mistakenly applies strict scrutiny by
misreading *Salerno*, which addressed the consideration of
danger to the community in bail determinations, as holding
that the Bail Reform Act implicated a fundamental liberty
interest. *Salerno* held just the opposite. The Court

---

[1] If you find it peculiar that the Supreme Court would apply strict
scrutiny without telling us, you have good reason. It certainly knows how
to say that it is applying strict scrutiny when it does so. *See, e.g.*, *Johnson
v. California*, 543 U.S. 499, 507 (2005) (explaining that it is applying
"strict scrutiny"); *Bush v. Vera*, 517 U.S. 952, 976 (1996) (same); *Miller
v. Johnson*, 515 U.S. 900, 920 (1995) (same); *Bernal v. Fainter*, 467 U.S.
216, 227 (1984) (same).

acknowledged that liberty, in its broadest sense, is a fundamental right. *Salerno*, 481 U.S. at 750. It explained, however, that the right asserted in *Salerno* was more limited; it was the right to bail *after* "the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." *Id*. at 751. As to *that* right, the Court said: "we cannot categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id*. (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)). Thus, rather than holding that liberty is a fundamental right in all instances, the Court held that the liberty right "under the[] circumstances" of the Bail Reform Act was *not* fundamental. *Id*.

The Court's narrow construction of the liberty interest at stake in *Salerno* is consistent with its instruction that "'[s]ubstantive due process' analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations and internal quotations omitted). Thus, we must "carefully formulat[e]" the liberty interest, *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997), and define it "*narrowly*," *Flores v. Meese*, 913 F.2d 1315, 1330 (9th Cir. 1990) (emphasis supplied). Only then can we determine whether the asserted right is fundamental.

The majority ignores that instruction and concludes that the Bail Reform Act and Proposition 100 impinge on some generalized fundamental liberty right. In fact, the majority makes no effort to even define the right at stake. But it isn't

simply "liberty" as the majority would have it. Rather, Proposition 100 implicates an arrestee's alleged right to bail where the proof is evident or the presumption great that the arrestee committed a serious felony offense,[2] and there is probable cause to believe the arrestee has entered or remained in the United States illegally. That is, the right is not merely to be free from detention, but to be free from detention "under these circumstances." *Salerno*, 481 U.S. at 751.

In my view, this asserted right is not "so rooted in the traditions and conscience of our people as to be ranked fundamental." *Id.*; *see, e.g.*, *Demore v. Kim*, 538 U.S. 510, 522 (2003) (stating, in approving the detention of aliens awaiting deportation, that "this Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens"); *Carlson v. Landon*, 342 U.S. 524, 545 (1952) ("The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases[.]"); *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. App. 1981) ("[A] fundamental right to bail was not universal among the colonies or among the early states;" "the language of several state constitutions explicitly limiting the power of the judiciary to set excessive bail negates any suggestion that the excessive bail clause was intended to restrict the definition of bailable offenses by the legislature."), *cert. denied*, 455 U.S.

---

[2] "Serious felony offense" is statutorily defined as "any class 1, 2, 3 or 4 felony or [aggravated driving under the influence]." Ariz. Rev. Stat. Ann. § 13-3961(A)(5)(b).

1022 (1982). Because the right is not fundamental, strict scrutiny does not apply.[3]

## B

Whatever substantive due process standard *Salerno* provides—and I concede that there is some ambiguity— Proposition 100 meets it. Nobody disputes that "Arizona has a compelling interest in ensuring that persons accused of serious crimes, including undocumented immigrants, are available for trial." Maj. Op. at 19. And Proposition 100 is

---

[3] Given that the Court in *Salerno* said that the right at issue was not fundamental, *id*. at 751, and never applied strict scrutiny, how does the majority divine that strict scrutiny applies to Proposition 100? Apparently from a couple of fractured Supreme Court opinions that hint, but do not hold, that *Salerno* may have meant something it never said. *See Flores*, 507 U.S. at 302 (including *Salerno* in a string cite about defining "substantive due process"); *Foucha v. Louisiana*, 504 U.S. 71, 80–83 (1992) (discussing *Salerno* but not elucidating its standard). I am not convinced.

*Flores* cited *Salerno* merely for the proposition that there is "a substantive component" to the Constitution's due process guarantee. *Flores*, 507 U.S. at 302–03. Surely the majority would not suggest that the other cases cited in the same string cite—*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992), and *Bowers v. Hardwick*, 478 U.S. 186 (1986)—applied strict scrutiny to any fundamental right. Moreover, the page of *Salerno* cited simply defines "substantive due process"; it does not mention fundamental rights or strict scrutiny. *See* 481 U.S. at 746. Similarly, *Foucha* cites the same page of *Salerno* for the same limited proposition, surrounded by citations to cases that merely describe substantive due process. 504 U.S. at 80 (citing *Zinermon v. Burch*, 494 U.S. 113 (1990); *Salerno*, 481 U.S. at 746; and *Daniels v. Williams*, 474 U.S. 327 (1986)). True, *Foucha* discusses *Salerno* at greater length, but for the circumstances in which a person can be detained because he poses "a danger to others or to the community," not because of flight risk. *Id.* at 81.

"careful[ly] delineat[ed]" and "carefully limited"—it is even "narrowly focuse[d]." *Salerno*, 481 U.S. at 750–51, 755. Several fundamental errors in the majority's opinion lead it to conclude otherwise.

First, by ignoring all evidence to the contrary, the majority concludes that "unmanageable flight risk posed by undocumented immigrants . . . has not been shown to exist." Maj. Op. at 37. Tell that to the Maricopa County Attorney who, from his vantage on the front line just a month before the Proposition 100 vote, thought flight risk among illegal aliens in Arizona was "a *tremendous problem*." *Lou Dobbs Tonight* (CNN television broadcast Oct. 13, 2006) (emphasis supplied).[4] The majority insists that the record does not substantiate this claim, but the claim—by the Maricopa County Attorney no less—is part of the record.[5] It is one thing for my colleagues to declare that Proposition 100 is an excessive measure to address Arizona's flight problem; reasonable minds can disagree. It is quite another for an Article III court to tell Arizona, based on this record and considering the majority vote of the Arizona legislature and electorate in favor of Proposition 100, that its perceived

---

[4] The prosecutor also testified before the Arizona Senate Judiciary Committee, explaining that there were "numerous examples of serious and violent criminals that [the] Maricopa County Attorney's Office has prosecuted in the past that have escaped justice because they have [] slipped back across the border after they've been released." *Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).

[5] The majority responds to the Maricopa County Attorney's statements by attempting to discredit his testimony through extra-record evidence not cited to or relied on by any party. Maj. Op. at 22–23, n.6. Of course, the majority cannot so easily impeach the four out of five Arizona voters who must live with the problem the majority concludes does not exist.

problem is not really a problem. Maj. Op. at 37. Even the Arizona courts have concluded that "Proposition 100 reflects that [the Arizona] electorate and Legislature perceived pretrial detention as a potential solution to a pressing societal problem." *Hernandez v. Lynch*, 167 P.3d 1264, 1274 (Ariz. Ct. App. 2007) (internal quotations and citations omitted). They are the ones who have to live with it.

Second, the majority takes issue with Proposition 100 not being a widely shared legislative judgment because few states categorically deny bail for illegal aliens. Maj. Op. at 29–30. While factually true, perspective here is critical. As an initial matter, novelty alone does not render a law unconstitutional. *See Ewing v. California*, 538 U.S. 11, 24 (2003) (holding that defendant's sentence under California's novel "three strikes" law was not unconstitutional). In *Ewing*, the Supreme Court explained that "[t]hough three strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important policy decisions is longstanding." *Id*. My colleagues give no deference to the policy judgment of the Arizona legislature or the democratic views of the electorate.

Moreover, we cannot judge this case with blinders on. Arizona faces unique challenges as one of four states bordering Mexico. Indeed, "Arizona bears many of the consequences of unlawful immigration . . . . Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population." *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). "[I]n the State's most populous county, these aliens are reported to be responsible for a disproportionate share of serious crime." *Id*. I find it hardly surprising that other states have not enacted their own Proposition 100 laws. Kansas, for example, may have its

share of illegal immigrants, but certainly not to the extent of Arizona. More importantly, only four states—Arizona among them—provide serious felony offenders with such a quick and convenient route into Mexico.**[6]** Thus, while Proposition 100 may be relatively unique among the fifty states, that's nothing more than a reflection of Arizona's unique flight risk problem and geography.

Third, the majority mistakenly demands "findings, studies, statistics or other evidence . . . showing that undocumented immigrants as a group pose either an unmanageable flight risk or a significantly greater flight risk than lawful residents." Maj. Op. at 21. Arizona is not required to support its legislative judgment with empirical studies. This is a slippery slope on which the majority is quick to tread, and one which threatens the delicate balance between the judiciary and the people we serve.

While we have imposed empirical fact-finding requirements in a few contexts,**[7]** those are the exceptions to

---

**[6]** The majority's argument also ignores a host of practical concerns facing border states like Arizona, such as the time and expense in trying to apprehend felony fugitives in Mexico and elsewhere, and the cumbersome and lengthy extradition process required to bring fugitives back to Arizona to face justice.

**[7]** The most prevalent example is in the context of content-based regulations under the First Amendment. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009). But even in the First Amendment context, the Supreme Court has explained that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 378 (2000). I find it neither novel nor implausible that a border state struggles to prevent serious felony offenders who are

the rule. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 21 (2005) ("[W]e have never required Congress to make particularized findings in order to legislate, absent a special concern such as the protection of free speech." (citations omitted)). Indeed, the Supreme Court has explained that "[w]hile Congressional findings are certainly helpful . . . the absence of particularized findings does not call into question Congress' authority to legislate." *Id*. We have never held that a state legislature— let alone a state's voting electorate, as here—must prove its flight-risk concerns with empirical data. Nor have we been instructed to require supporting data in connection with pretrial detention schemes—not in *Salerno* and not in *Demore*.[8] The majority's empirical data requirement, imposed today by judicial fiat, is particularly inappropriate and dangerous in this case, where Arizona voters passed Proposition 100 by a whopping 78 percent. *See Nixon*, 528 U.S. at 394 (observing, even under the heightened requirements of First Amendment challenges, that a 74-percent statewide vote passage rate "certainly attested to the

---

in the country illegally from fleeing before trial. The majority decrees that Arizonans will just have to live with it.

[8] In *Salerno*, the Supreme Court merely mentioned, in a single sentence and without any hint of a requirement, that Congress made findings in enacting the Bail Reform Act. 481 U.S. at 750. In *Demore*, the respondent argued that Congress had no evidence that individualized bond hearings would be ineffective, but the Court observed that Congress had evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens absconding. 538 U.S. at 528. *Demore* did not hold that congressional fact-finding was required; but even if we read in such a requirement, Arizona's legislators met that requirement by taking testimony to that effect. *See Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).

perception" that the challenged law was necessary to remedy the state's identified concern).

Finally, the majority errs by effectively precluding the use of irrebuttable presumptions in the bail context. Proposition 100 "plainly is not carefully limited," says the majority, "because it employs an overbroad, irrebuttable presumption rather than an individualized hearing" to assess flight risk. Maj. Op. at 24. That conclusion relies on the premise that individualized hearings would solve Arizona's troubles. In *Demore*, the Supreme Court upheld a categorical bail prohibition in part because individualized hearings had proven unsuccessful. 538 U.S. at 528. Here, like in *Demore*, Arizona has *already tried* determining flight risk on an individualized basis, considering factors such as family ties, employment, and length of residency in the community. If you believe the record—and Plaintiffs-Appellants have given us no reason not to—the pressing problem of illegal aliens absconding before trial survived these individualized hearings. Thus, Proposition 100's lack of individualized flight risk determinations cannot render its irrebuttable presumption excessive. *See Demore*, 538 U.S. at 528.

Applying well-established substantive due process principles to this record reveals that Proposition 100—while distasteful to some—survives substantive due process review.

## II

The majority also errs by finding Proposition 100 impermissibly punitive, although it purports to leave untouched the district court's factual conclusion that Proposition 100 was not intended to impose punitive restrictions. *Salerno* provides the two-part test to determine

whether the pretrial detention scheme at issue constitutes "impermissible punishment or permissible regulation." *Salerno*, 481 U.S. at 747. First, we look to legislative intent to determine whether the legislature "expressly intended to impose punitive restrictions." *Id*. Second, we ask "whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id*. (alterations and internal quotation marks omitted). In other words, in the absence of an express punitive intent, "the punitive/regulatory distinction turns on" whether the pretrial detention scheme is "excessive in relation to the regulatory goal [the legislature] sought to achieve." *Id*.

Reviewing the record as a whole, including legislative history and election-related materials, it is clear that Arizona legislators and voters passed Proposition 100 as a regulatory measure to ensure illegal aliens who commit serious felony offenses stand trial. But don't just take my word for it, *see Lopez-Valenzuela v. Cnty. of Maricopa*, 719 F.3d 1054, 1060–61 (9th Cir. 2013) (reviewing the record de novo); District Judge Susan Bolton and the Arizona Court of Appeals conducted their own independent review of the record and reached the same conclusion, *Lopez-Valenzuela v. Maricopa Cnty.*, No. 08-00660, at 10 (D. Ariz. March 29, 2011) ("Having reviewed the voluminous evidence submitted in this case, the Court finds that the record as a whole does not support a finding that Proposition 100 was motivated by an improper punitive purpose."); *Hernandez*, 167 P.3d at 1273 ("[W]e hold that the purpose behind Proposition 100 was not to punish illegal aliens, but to prevent them from fleeing before trial."). The majority wisely declines to disturb these findings. Maj. Op. at 35 ("[W]e see no reason to revisit

those conclusions on appeal."). Yet my colleagues spend several pages attempting to impeach them.

Turning to the second step, we all agree that "Arizona has a compelling interest in ensuring that persons accused of serious crimes, including undocumented immigrants, are available for trial." Maj. Op. at 19. But the majority concludes that Proposition 100 is excessive in relation to its purpose. Maj. Op. at 37. It isn't.

Proposition 100, like the Bail Reform Act, "carefully limits the circumstances under which detention may be sought." *Salerno*, 481 U.S. at 747. Two threshold requirements must be met before an individual can be denied bail pursuant to Proposition 100. First, the court must find, at the arrestee's initial appearance, that there is probable cause to believe that the arrestee has entered or remained in the United States illegally. Ariz. R. Crim. P. 7.2(b). But more than that, the court must also find that the proof is evident or the presumption great that the individual committed a "serious felony offense." *Id.*; Ariz. Const. art. II § 22(4).

An arrestee is also able to challenge this initial determination by "mov[ing] for reexamination of the conditions of release." Ariz. R. Crim. P. 7.4(b). Upon such a motion—and whether or not the arrestee alleges new facts—a hearing must be held on the record "as soon as practicable but not later than seven days after filing of the motion." *Id*. These procedural and substantive protections make Proposition 100 far from a "scattershot attempt to incapacitate those who are merely *suspected*" of being in the country illegally or of committing a serious felony offense. *Salerno*, 481 U.S. at 750 (emphasis supplied).

For years, Arizona tried making individualized flight-risk determinations for aliens alleged to have committed serious felony offenses. That system didn't solve Arizona's particularly acute flight-risk problem. Its voters then overwhelmingly approved Proposition 100 as a measured response in light of the state's prior efforts. How can that be excessive?

### III

The majority does not reach Plaintiffs-Appellants' remaining claims because it doesn't have to. However, I remain convinced that the district court properly awarded Defendants-Appellees summary judgment on those claims as well. I stand by the reasons set forth in that opinion. *See Lopez-Valenzuela*, 719 F.3d at 1064–73. For all these reasons, I respectfully dissent.

O'SCANNLAIN, Circuit Judge, dissenting:

Today, the majority divines, under the rubric of substantive due process, that Arizona's categorical denial of bail is "excessive" notwithstanding the State's interest in mitigating flight risk. Remarkably, the majority scarcely mentions the Constitution's command that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII.

I respectfully dissent from our expansion of substantive due process and neglect of express constitutional text.[1]

---

[1] Because I believe that the majority's substantive due process analysis is wrong as well as unnecessary, I also join Judge Tallman's dissent.

I

A

"[R]eluctant to expand the concept of substantive due process," *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992), the Supreme Court held in *Graham v. Connor*, 490 U.S. 386 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (alteration in original) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.)). "*Graham . . . requires* that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (emphasis added) (citing *Graham*, 490 U.S. at 394).

The majority flouts this requirement. It "first" analyzes the Proposition 100 laws under "general substantive due process principles," Maj. Op. at 15, 15–34, then considers whether the Proposition 100 laws violate the specific due process prohibition on imposing punishment before trial, *id.* at 15, 34–37. My colleagues in the majority decline to consider—ever—whether the Proposition 100 laws violate the Eighth Amendment. *Id.* at 38–39 & n.16.

One would hardly know, after reading the majority's forty-three page opinion—analyzing whether Arizona's denial of bail was excessive in light of the flight risk posed by illegal immigrants—that, under the Eighth Amendment of the Constitution itself, "[e]xcessive bail shall not be required."[2] Indeed, one might think that "[t]he *Court* has prohibited excessive bail." Maj. Op. at 9 (emphasis added).

B

To be sure, specific constitutional provisions do not preclude recognition of substantive due process rights that touch on related subjects. *Lewis*, 523 U.S. at 843 ("Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment."); *see, e.g.*, *Lanier*, 520 U.S. at 272 n. 7 (*Graham* did "not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments."). Not every conceivable constitutional dispute regarding bail is resolved by the Eighth Amendment. But the question whether denying bail to illegal immigrants *based on flight risk* is unconstitutionally excessive is posed, precisely, by the Excessive Bail Clause. *See Stack*, 342 U.S. at 4–5.

The majority relies primarily on *United States v. Salerno*, 481 U.S. 739 (1987), to justify its substantive due process inquiry, but I suggest that it has not read that case carefully enough. *Salerno* does not excuse the majority's disregard of

---

[2] A sharp-eyed reader might spot the majority's brief gestures toward the Eighth Amendment's prohibition in its discussion of *Stack v. Boyle*, 342 U.S. 1 (1951). Maj. Op. at 9–10.

the Eighth Amendment, because this case, unlike *Salerno*, concerns detention *based on flight risk*.

Two substantive due process arguments against the Bail Reform Act of 1984 were rejected in *Salerno*: The Court analyzed whether "the Due Process Clause prohibits pretrial detention on the ground of danger to the community." *Id.* at 748. And the Court considered whether it was unconstitutional "because the pretrial detention it authorizes constitutes impermissible punishment before trial." *Id.* at 746. Both claims were grounded in the Court's substantive due process precedents; they required the Court to decide whether the Bail Reform Act violated already established due process rights. *See id.* at 749–51 (detention based on dangerousness) (citing, *inter alia*, *Schall*, 467 U.S. 253, *Addington v. Texas*, 441 U.S. 418 (1979), and *Carlson v. Landon*, 342 U.S. 524 (1952)); *id.* at 746–47 (punishment before trial) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979) and *Schall v. Martin*, 467 U.S. 253 (1984)). Neither claim implicated the Eighth Amendment inquiry proper to *this* case—whether the Proposition 100 bail laws are constitutionally "excessive" based on flight risk.

1

As to its "general substantive due process principles," the majority misreads *Salerno* by conflating detention based on dangerousness, which the Court considered, with detention based on flight risk, which the Court did not. In *Salerno*, the Court rejected the "categorical imperative"—advanced by the Second Circuit—that the Due Process Clause "prohibits pretrial detention on the ground of *danger to the community*." *Id.* at 748 (emphasis added). Because due process does not "erect[] an impenetrable 'wall'" to such detention, the Court

reasoned "that the present statute providing for pretrial detention *on the basis of dangerousness* must be evaluated in precisely the same manner"—applying means-end scrutiny— "that we evaluated the laws in the cases discussed above." *Id.* at 748–49 (emphasis added).

Nothing in *Salerno* suggests that detention *based on flight risk* should be evaluated in the same manner. *See id.* at 749 (Detainees "concede and the Court of Appeals noted that an arrestee may be incarcerated until trial if he presents a risk of flight.").[3] Indeed, the Eighth Amendment secures the specific right not to be required to post excessive bail in light of flight risk. *See Stack*, 342 U.S. at 4–5. The majority's substantive due process inquiry is thus inappropriate under *Graham*. *See, e.g.*, *John Corp. v. City of Houston*, 214 F.3d 573, 582 (5th Cir. 2000) ("The purpose of *Graham* is to avoid expanding the concept of substantive due process where another constitutional provision protects individuals against the challenged governmental action.").

2

The Court's substantive due process jurisprudence indeed secures the specific right to be free from punishment before trial. *E.g.*, *Schall*, 467 U.S. at 269. But the majority misapplies that jurisprudence, asking under substantive due process questions properly considered under the Eighth Amendment and thereby displacing specific constitutional text.

---

[3] Thus, the distinction between denial of bail for dangerousness and denial of bail based on flight risk is "recognized" in *Salerno* itself, *contra* Maj. Op. at 39 n.16, the majority's misinterpreted dicta notwithstanding, *cf.* Tallman Dissent at 57 n.3.

Our role is to question whether a particular "disability is imposed for the purpose of punishment." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). To decide whether the legislative purpose was punitive, in the absence of an "express intent to punish," we must discern whether pretrial detention is "excessive in relation to the alternative purpose assigned [to it]." *Id.* Answering that question, *Salerno* considered the "*incidents* of pretrial detention" under the Bail Reform Act— such as prompt detention hearings and whether pretrial detainees were housed separately from postconviction detainees—and concluded that they did not reveal an improper punitive purpose. 481 U.S. at 747 (emphasis added). By contrast, the majority here considers the *substance* of Proposition 100—categorical denial of bail—and decides it is excessive notwithstanding the heightened risk of flight, the very question properly considered under the Eighth Amendment.[4]

C

The Supreme Court tells us not to rely on generalized substantive due process "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125. The majority's incautious expansion of substantive due process confirms the

---

[4] The majority's confusion is also evident in what meaning it affords a finding of "excessiveness." In *Schall*, 467 U.S. at 269, and in *Salerno*, 481 U.S. at 747, excessiveness *may* indicate an improper punitive purpose. In the majority's view, however, "excessiveness" is an independent constitutional violation under substantive due process. *See* Maj. Op. at 36–37. Here, the majority assumes "that Proposition 100 was adopted for the permissible regulatory purpose of managing flight risk." *Id.* at 36. Under substantive due process, that should have been the end of the inquiry.

wisdom of such advice. Grounded in neither text nor history, the majority's due process inquiry simply replaces legislative and popular judgment with its own, at least until Arizona provides sufficiently robust statistical analysis to suit.

If we must remove "a difficult question of public policy . . . from the reach of the voters" of Arizona, *Schuette v. Coal. to Defend Affirmative Action*, 134 S. Ct. 1623, 1637 (2014), we should pay them the respect of grounding our decision in the textual guarantees of the Constitution, not the nebulous haze of substantive due process.

II

The question we *ought* to have considered is whether the Eighth Amendment contains any substantive restrictions on Arizona's authority to declare certain classes of crimes or criminals nonbailable, and, if so, whether Proposition 100 violates such restrictions.[5] Without thorough briefing on such questions from the parties, but guided by sparse discussion in Supreme Court precedent, I offer a tentative answer.

In *Carlson*, the Supreme Court rejected the proposition that the Eighth Amendment required certain detainees to be admitted to bail:

> The bail clause was lifted with slight changes from the English Bill of Rights Act.

---

[5] For the purposes of this dissent, I assume the Excessive Bail Clause has been incorporated against the States. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3034 & n.12 (2010) (citing *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) (noting that the Excessive Bail Clause "has been assumed to have application to the States")).

> In England that clause has never been thought
> to accord a right to bail in all cases, but
> merely to provide that bail shall not be
> excessive in those cases where it is proper to
> grant bail. When this clause was carried over
> into our Bill of Rights, nothing was said that
> indicated any different concept. *The Eighth
> Amendment has not prevented Congress from
> defining the classes of cases in which bail
> shall be allowed in this country.*

342 U.S. 524, 545–46 (1952) (emphasis added) (footnotes
omitted). In *Salerno*, the Court reserved the question
"whether the Excessive Bail Clause speaks at all to Congress'
power to define the classes of criminal arrestees who shall be
admitted to bail." 481 U.S. at 754.[6]

As noted in *Carlson*, the Eighth Amendment echoes the
English Bill of Rights of 1689. *Compare* U.S. Const. amend.
VIII ("Excessive bail shall not be required, nor excessive
fines imposed, nor cruel and unusual punishments inflicted."),
*with* English Bill of Rights 1689 (declaring that "excessive
bail ought not to be required, nor excessive fines imposed,
nor cruel and unusual punishments inflicted"). But "bail was
not an absolute right in England." William F. Duker, *The
Right to Bail: A Historical Inquiry*, 42 Albany L. Rev. 33, 77
(1977). The English Bill of Rights did not restrain Parliament

---

[6] Lopez and Castro rely, as did the detainees in *Salerno*, on *Stack*'s
dictum that "[b]ail set at a figure higher than an amount reasonably
calculated to [to assure the presence of the accused] is 'excessive' under
the Eighth Amendment." 342 U.S. at 5. But that standard addresses how
the Eighth Amendment constrains courts. It does not answer how, if at all,
the Amendment constrains legislatures.

from declaring which classes of crimes were bailable.  *See* Hermine Herta Meyer, *Constitutionality of Pretrial Detention*, 60 Geo. L. J. 1139, 1155–58 (1972); *see also* Duker, *supra*, at 81.  Of course, "that Parliament classified certain offenses as nonbailable is not an absolute indication that Congress was to enjoy the same power" under the Eighth Amendment, "to define bailable and nonbailable offenses." *Hunt v. Roth*, 648 F.2d 1148, 1159 (8th Cir. 1981), *vacated sub nom. Murphy v. Hunt*, 455 U.S. 478 (1982).

Early American constitutions suggest, nonetheless, that their prohibitions of "excessive bail" limited the judiciary, not the legislature.  *E.g.*, Md. Const. of 1776, § 22 ("That excessive bail ought not to be required . . . by the courts of law."); N.H. Const. of 1784, art. I, § 33 ("No magistrate or court of law shall demand excessive bail or sureties . . . ."); *see generally*, Duker, *supra*, at 79–83.  "[B]y the time of the formulation of the Bill of Rights by the first Congress of the United States, the experience in America had been to grant bail in cases which were bailable, *as determined by the legislature*."  *Id.* at 83 (emphasis added).  Legislatures were free to declare horse stealing, for example, bailable or not. *Compare* Caleb Foote, *The Coming Constitutional Crisis: Part I*, 113 U. Pa. L. Rev. 959, 976–77 (1965) (describing the failure by one vote of Jefferson's bill to render horse theft bailable), *with* Duker, *supra*, at 82 & n. 293 (noting that Georgia's legislature denied bail for horse stealing despite constitutional guarantee that "excessive bail" shall not be "demanded").

The First Congress's debates over the Bill of Rights contain no hint that the originally understood meaning of the Eighth Amendment's Excessive Bail Clause was any different from the right guaranteed by the same words in the

English Bill of Rights or the State constitutions. *Carlson*, 342 U.S. at 545 & n. 44; *see also* Duker, *supra*, at 85–86.

I tentatively conclude, therefore, based on the text of the Constitution and the history of the right to bail, that the Eighth Amendment secures a right to reasonable bail where a court has discretion to grant bail. *Cf. Ex parte Watkins*, 32 U.S. (7 Pet.) 568, 573–74 (1833) (Story, J.) ("The [E]ighth [A]mendment is addressed to courts of the United States exercising criminal jurisdiction, and is doubtless mandatory to them and a limitation upon their discretion."). It does not, however, restrict legislative discretion to declare certain crimes nonbailable. *See* Duker, *supra*, at 86–87 ("Although the amendment limits the discretion of the courts in setting bail, Congress is free to determine the cases for which bail shall be allowed, or whether it shall be allowed at all."); Meyer, *supra*, at 1194 (The Constitution "reserved for Congress the right to make legislative changes [to bail] whenever required by changed circumstances."). I have found no evidence to suggest that the Excessive Bail Clause, as originally understood, limited legislative discretion.[7]

---

[7] Even Professor Foote, foremost proponent of the view that the Eighth Amendment was "meant to provide a constitutional right to bail," conceded that "the underlying right to the remedy of bail itself . . . was omitted" from the Constitution, albeit through "inadvertence." Foote, *supra*, at 968, 987. I agree with the perceptive law student who dismissed Foote's argument as supported by "little more than speculation about the workings of the minds of George Mason and the Framers," and "flawed" speculation at that. Donald B. Verrilli, Jr., Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 340 (1982).

### III

During Congress's debates on the Bill of Rights, the only comment on the Excessive Bail Clause was by Samuel Livermore, Representative for New Hampshire, "who remarked: 'The clause seems to have no meaning to it, I do not think it necessary. What is meant by the terms excessive bail? Who are the judges . . . ?'"[8] Ignoring the first question, regrettably, the majority firmly answers the second: "We are."

On the majority's chosen ground, Judge Tallman has the better of the argument, so I happily join his dissent. But I regret the majority's impulse to clash in the *terra incognitia* of substantive due process. Guided by text and history, we might have found surer footing by applying the Excessive Bail Clause.

I respectfully dissent.

---

[8] Duker, *supra*, at 86 (quoting 1 Cong. Deb. 754 (Gales & Seaton eds. 1834)).